UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| In the Matter of the Seizure of | No. ___20-mj-12___ |
| 20-013-04 | **APPLICATION FOR SEIZURE WARRANT "REDACTED"** |

I, Corey Vickery, being duly sworn depose and say:

I am a Special Agent with the Internal Revenue Service, Criminal Investigative Division, and based upon information obtained from other sources, as set forth in paragraphs 5 and 6 of my affidavit, probable cause exists to conclude that the aforementioned property, listed in Attachment A, are proceeds of illegal activity or are derived from proceeds of illegal activity, including conspiracy to commit wire fraud, conspiracy to launder monetary instruments, wire fraud, and laundering of monetary instruments, and is therefore subject to seizure and forfeiture under Title 18, United States Code, Sections 981 (a)(1)(A), (a)(1)(C) and (b), and 982(a)(1), (a)(2)(E), (a)(2)(F), and (b)(1), Title 21, United States Code, Section 853, and Title 28, United States Code, Sections 1355(b)(2) and 2461, and by utilizing provisions of Title 18, United States Code, Section 985.

The facts to support a finding of Probable Cause are contained in my Affidavit and Attachment A, both of which are filed herewith, attached hereto, and incorporated by reference.

Corey Vickery, Special Agent
IRS – Criminal Investigation

Sworn to before me, and subscribed in my presence on the ___7th___ day of February, 2020, at Sioux Falls, South Dakota.

KAREN E. SCHREIER
United States District Judge

## ATTACHMENT A "REDACTED"

### Property to Be Seized

The property is more fully described as:

a.   Vehicle identified as:  Mercedes GLC250 4M, bearing VIN Number  ; and

b.   Silver coins originally worth approximately U.S. $2,757,862.20, which were seized in June 2019, pursuant to a search warrant executed at the residence located at ▉▉▉▉▉▉▉▉▉ ▉▉▉▉ .

The associated seizure warrant authorizes the seizure of this property.

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

In the Matter of the Seizure of

**20-013-04**

20-mj-12

**AFFIDAVIT IN SUPPORT OF WARRANT
TO SEIZE PROPERTY SUBJECT TO
FORFEITURE "REDACTED"**

---

1.      I, Corey Vickery, being duly sworn on oath, depose and state the following:

2.      I am employed as a Special Agent with the Internal Revenue Service, Criminal Investigation Division (IRS-CID) and have been so employed since September of 2006.  My responsibilities include the investigation of possible criminal violations of the internal revenue laws under Title 26 of the United States Code and related offenses, particularly as found in Title 18 and Title 31 of the United States Code.  Since becoming a special agent with IRS-CID, I have received formal training in conducting criminal tax investigations, money laundering investigations, and identity theft investigations.  In my capacity as a special agent with IRS-CID, I have investigated or participated in the investigation of a variety of tax and related financial offenses, including tax evasion, money laundering, identity theft violations, and Bank Secrecy Act violations.  In the course of my training and experience, I have become familiar with the types of records businesses typically maintain in the course of their regular activity, including ledgers, journals, invoices, receipts, and bank documents.  A large part of my duties as an IRS-CID special agent has involved analyzing these types of records to determine the existence of criminal activity and to develop evidence of criminal activity.  I hold a Bachelor of Arts degree with a double major in Public Accounting and Business Administration.   Before joining IRS-CID, I was employed with a public accounting firm for over a year and as a Corporate Accounting Controller at a large vehicle dealership in Sioux Falls for approximately a year and a half.  In those positions, I routinely helped prepare corporate and individual tax returns, payroll tax returns, financial statements, cash flow statements, ledgers, journals, analyze bank documents, and also reviewed the accounts receivable and accounts payable transactions for various companies.

3.      I have participated in and conducted criminal investigations of individuals involved in illegal activities for possible violations of the Internal Revenue Code and related offenses, including offenses related to money laundering, investment fraud, Ponzi schemes, structuring of financial

transactions, and narcotics trafficking.  These investigations have involved conducting surveillance, interviewing third parties, executing search warrants, executing arrest warrants, executing seizure warrants and securing seized evidence.

4.     My investigations and participation in investigations of illegal activities has given me knowledge to recognize various methods used by individuals to conceal their assets and illegal income from the Government and other third parties.  Based on my training, experience and participation in this and other criminal investigations I know that:

    a.    Those involved in illegal activities often place assets in names other than their own to conceal these assets from law enforcement officials and to launder money.

    b.    Those involved in illegal activities often place assets in the names of business and corporate entities to conceal these assets from law enforcement officials and to launder money.

    c.    Those involved in illegal activities must maintain and have quick access to large amounts of currency or other liquid assets.

    d.    Those involved in illegal activities often attempt to legitimize their profits by using banks and their services (i.e., safe deposit boxes).

5.     I am the IRS-CID case agent regarding the investigation of Lorin William Rosier, Nathan Peachey, and John Rick Winer.  I have been advised as to the legal authority, as set forth in this affidavit, regarding seizure of assets and property, real and personal, in the United States and Norway, all of which are identified in Attachment A, attached hereto and incorporated by reference. This affidavit is submitted in support of an application for a seizure warrant for the following items:

    **a.**    **Mercedes GLC250 4M**
        **VIN:** ███████████████

    **b.**    **Silver coins**

6.     Probable cause exists to conclude that the aforementioned property was purchased or intended to be purchased with proceeds generated from an illegal investment fraud scheme and related wire fraud activity or of proceeds traceable to such an exchange, or involved in money laundering activity, and is therefore subject to seizure and forfeiture under Title 18, United States Code,

Sections 981(a)(1)(A), (a)(1)(C),* and (b), and 982(a)(1), (a)(2)(E), (a)(2)(F), and (b)(1), Title 21, United States Code, Section 853, and Title 28, United States Code, Sections 1355(b)(2) and 2461, and by utilizing provisions of Title 18 United States Code, Section 985, all of which relate to forfeiture for violations of the Title 18, United States Code, Sections 2, 1341, 1343, 1349, 1956, and 1957. The restraint, freezing, and/or seizure of real and personal property located in Norway is authorized pursuant to the United Nations Convention Against Transnational Organized Crime (the Convention), to which the United States and Norway are both parties, other relevant international cooperation and forfeiture laws of Norway, and as a matter of comity and reciprocity. Article 18 of the Convention requires that the parties provide one another with the widest measure of mutual legal assistance in relation to offenses covered by the Convention, including the seizures and restraint/freezing of assets. This request is made for the purpose of investigating and prosecuting offenses within the scope of criminal conduct encompassed by the Convention: specifically, participation in an organized criminal group by conspiring to commit a serious crime to obtain a financial or other material benefit; engaging in criminal activities in support of the organized criminal group; and/or organizing, directing, aiding, abetting, facilitating, or counselling the commission of serious crime involving the organized criminal group, under Article 5 of the Convention, and the laundering of the proceeds of crime, under Article 6 of the Convention. *See* Article 3(1)(a). The conduct underlying the criminal conduct charged in the indictment was committed by an organized criminal group as defined by Article 2(a) of the Convention, as three or more perpetrators have been working in concert since at least 2015 to conduct their investor fraud scheme in the United States and to launder the proceeds of that scheme in foreign jurisdictions. As required by Articles 3(1)(b) and 5, the offenses are also serious offenses as defined by Article 2(b) of the Convention because they are punishable by maximum terms of imprisonment that are greater than four years. As required by Article 3(1), the offenses are also transnational in nature, as defined in Article 3(2), in that they involved conduct in more than one state. Article 12 of the Convention requires that state parties adopt measures to enable the restraint/freezing and/or seizure of the proceeds of crime derived from offenses covered by the Convention (or property the value of which corresponds to such proceeds) and property, equipment, or other instrumentalities used in or destined for use in offenses covered by the Convention.

---

* *See* 18 U.S.C. § 1956(c)(7)(A). The following property is subject to forfeiture to the United States: Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity," which is, among other things, any act or activity constituting an offense listed in section 1961(1) of this title, including sections 1341 (relating to mail fraud), 1343 (relating to wire fraud), 1956 (relating to the laundering of monetary instruments), or 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), or a conspiracy to commit such offense.

## Probable Cause Summary

7.      In October 2016, the South Dakota Division of Criminal Investigation contacted the U.S. Department of Treasury, Internal Revenue Service – Criminal Investigation ("IRS-CI") about a citizen in Lake Norden, South Dakota, who transferred approximately $700,000 from a bank account in South Dakota to an account controlled by WINER in New Mexico. When interviewed, the individual stated that he transferred the money to WINER because the U.S. banking system was set to "collapse" in December of 2016 and WINER was going to keep the money safe.

8.      WINER resided and operated in Farmington, New Mexico.   He appeared to believe in sovereign citizen type arguments.   These arguments typically falsely claim that federal laws do not apply to them.   WINER helped operate an investment/trust account that was referred to by clients as a "safe holding account."  WINER's clients/investors transferred their money to WINER for him to "keep it safe" from future events, such as the collapse of the U.S. Banking system.  WINER had several different business names under which he operated, including the HOUSE OF WINER TRUST, AG ENTERPRISES LLC, and JACOBS PROVISION TRUST.

9.      The South Dakota resident stated that WINER never provided any information that would allow him to check on, or keep track of, the money he sent to WINER; WINER also never provided the resident with an account number or online access to view the balance of his account via the Internet.  The South Dakota resident further stated that multiple other people from the region also had transferred money to WINER to keep their money safe from a banking collapse.

10.     Bank records reviewed by IRS-CI showed that WINER received approximately $2.5 million to date from "clients."  The records revealed that WINER was associated with another individual named NATHAN PEACHEY. PEACHEY was formerly involved with the Republic of the United States of America (RUSA), a sovereign citizen group where he served as "District Judge."

11.     Bank records show that once WINER received money from clients, the majority of the money was transferred to a bank account controlled by PEACHEY in the name of an entity called JERICHO OUTREACH at Bank of America.  PEACHEY in turn transferred the money to bank accounts in Norway located at DNB Bank.  Records also showed that investor money was frequently used by WINER and PEACHEY in the U.S. for personal expenditures.

12.     ███████████████████████████████████

[4]

**Financial Summary/Flow of Money:**

13. **Bank accounts controlled by JOHN RICK WINER:**
   - Bank of America Account # ending in 6307 registered to "House of Winer";
   - Bank of America Account # ending in 0032 registered to "Jacobs Provision Trust";
   - Wells Fargo Bank Account # ending in 8887 registered to "AG Enterprises."

**Total Amount of Money from Investors deposited into accounts controlled by JOHN RICK WINER:  $2,468,573.46**

14. **Disposition of Proceeds of Investor money paid to John Rick Winer:**
   - Money Transferred to JERICHO OUTREACH Account at Bank of America controlled by NATHAN PEACHEY: **($2,056,243.81)**
   - Money that appears to have been used personally by WINER: ~**($283,651.31)**
   - Money Returned to Investors: **($118,000)**

15. **Bank account Controlled by NATHAN PEACHEY in the US:**
   - Bank of America Account # ending in 7170 registered to "Jericho Outreach."

16. **Total Amount of Money from Investors transferred from JOHN RICK WINER to NATHAN PEACHEY / JERICHO OUTREACH Account ending in 7170: $2,056,243.81**

17. **Disposition of Proceeds of Investor Money Transferred to Jericho Outreach:**
   - Money Transferred to DNB Bank in Norway registered to "Jericho Outreach – Norway" Account: **($1,125,000.00)**
   - Money Transferred to DNB Bank in Norway registered to ▮▮▮▮▮▮: **($113,166.67)**
   - Money wired to JM Bullion to purchase silver coins: **($157,095.50)**
   - Money that appears to have been used for personal expenses by PEACHEY: **($592,037.84)**
   - Money Paid Back to Investors:  **($55,000.00)**

**Interviews**

18. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



19.

20.

21.

22.



23.

24.

25.

26.



27.

28.

29.

30.



### Letter Rogatory

31.    In March of 2018, a Letter Rogatory was granted by the United States District Court of South Dakota regarding this investigation and presented to Norwegian officials requesting bank and other financial documents located in Norway relating to this investigation.  In June and July of 2018, the Royal Norwegian Ministry of Justice and Public Security provided the United States Government with documents requested in the Letter Rogatory request.  These documents included bank records from DNB Bank, Real Estate records, Tax Administration documents, vehicle registration information, and invoices from third-party businesses that appeared to have conducted business with PEACHEY, ███████, and/or JERICHO OUTREACH.  Based on the records obtained from Norwegian Officials, investigators were able to identify the following additional information:

A.    ███████ at that time, appeared to reside at Lillihagvieien 128, 1365 Blommenholm, Baerum in Norway and was listed as the "Treasurer" for JERICHO OUTREACH.

B.    ███████ and PEACHEY were listed as authorized signors on the JERICHO OUTREACH bank account located at DNB Bank in Norway.

C.    PEACHEY was listed as the "Secretary" for JERICHO OUTREACH.

D.    ███████ also had a personal account at DNB Bank in Norway that received approximately $100,000 in wire transfers from a bank account belonging to PEACHEY in the U.S.  The funds for the transfers were generated from investor funds.

E.    JERICHO OUTREACH corporate records stated that ███████

[9]

"shall be the Treasurer of JERICHO OUTREACH for Norway Branch and shall hold joint-signatory powers with the Secretary and or Overseer of JERICHO OUTREACH registered in Norway."

F.    Bank records from Norway showed that ██████ communicated with Norwegian Bank officials on behalf of JERICHO OUTREACH on multiple occasions.

32.    A review of the bank records obtained through the Letter Rogatory show that between late 2015 and early 2018, approximately $6,125,000 was transferred from the U.S. to JERICHO OUTREACH accounts at DNB Bank in Norway.

33.    PEACHEY filed false paperwork with the DNB Bank in order to open the JERICHO OUTREACH accounts in Norway.  PEACHEY filed paperwork stating that JERICHO OUTREACH was a "Global Distributor" of "essential oils" and that they needed to open bank accounts in Norway to facilitate transactions for their Norwegian market.  The investigation to date has shown that PEACHEY was not a global distributor of essential oils; it appears that all of the money transferred to the accounts were generated from the fraudulent investment scheme.

34.    The approximate $6,125,000 in money transferred to the Jericho Outreach bank accounts in Norway was made up of the $1.125 million in investor money that was initially obtained through WINER and ultimately transferred to PEACHEY.  An additional $5,000,000 was transferred to the JERICHO OUTREACH account at DNB Bank in Norway in June of 2016 by an account registered to "THE JOSEPH PROJECT" in the US.  Investigators in South Dakota were able to discover that the funds from the "THE JOSEPH PROJECT" account were made up of funds derived from an investment fraud scheme being investigated by the FBI Phoenix Field Office.  Based on information obtained from FBI investigators in Phoenix, law enforcement was able to connect the $5,000,000 from the JOSEPH PROJECT to the JERICHO OUTREACH investment fraud scheme.  (Details relating to funds from the JOSEPH PROJECT are explained later on in the affidavit.)

35.    According to bank records from Norway, since January of 2018, PEACHEY purchased approximately $2,969,150 in Silver Coins from the JM Bullion Co. in the United States.  The funds used to purchase the silver were transacted through the JERICHO OUTREACH accounts at DNB Bank.

36.    Based on shipping records obtained through the Letter Rogatory, investigators learned that PEACHEY/JERICHO OUTREACH commercially shipped 4,672 Kilograms of silver coins from the United States to the JERICHO OUTREACH address in Norway listed as: ██████████ Sandvika, Norway.  Shipping records show that silver coins with a listed value of

[10]

"$2,757,862.20" were shipped from 1682 Middle Road, Middleburg, Pennsylvania 17842 (known residence of PEACHEY) and the "Shipper" is listed as "JERICHO OUTREACH." The recipient of the silver is listed as "JERICHO OUTREACH – Norway c/o CHRISTIAN CHARITY FOUNDATION" at the ▉▉▉▉▉▉▉▉ address in Sandvika. "Declaration of Importation" documents obtained from Norwegian officials list PEACHEY as the person that signed the form as the "Declaring Person" for the goods. Records show that JERICHO OUTREACH received a bill from the United Arab Emirates Airline through Brink's Global Services Security company in the amount of "$33,031.50" for shipping costs to fly the silver from JFK Airport in New York to the Airport in Oslo, Norway.

37.   Analysis of the JERICHO OUTREACH accounts at DNB Bank show that "investor" money was used for purposes other than intended. It appears that PEACHEY, ▉▉▉▉▉▉, and ROSIER used "investor money" to make the following purchases out of the DNB Bank Account in Norway that appear to be personal in nature:

A.   On April 27, 2017, JERICHO OUTREACH purchased a residence at Jongskollen 18, 1337 Sandvika, Norway in the amount of 11,275,697,00 Norwegian Krone (NOK) which equates to approximately $1,330,000 US Dollars. Sales records obtained show that JERICHO OUTREACH is the purchaser of the property, but PEACHEY and ▉▉▉▉▉▉ signed the purchase agreement for the residence, which was then registered in the name of the CHRISTIAN CHARITY FOUNDATION. PEACHEY serves as the "Secretary" and ▉▉▉▉▉▉ as the "Treasurer" for the CHRISTIAN CHARITY FOUNDATION. PEACHEY and ▉▉▉▉▉▉, by and through the CHRISTIAN CHARITY FOUNDATION paid for the residence in full; as such, there is no lien against the real property.

B.   Between 2017 and 2018, payments in the approximate amount of $1,163,500 were made to renovate and furnish the residence at Jongskollen 18 in Sandvika, Norway. These payments are summarized below:

1)   Between September 2017 and March 2018, payments were made to Bjerke Ventilasjon, which is a ventilation/HVAC company in Oslo, Norway. Payments were made in the amount of 754,625,00 (NOK) which equates to approximately $89,000 US Dollars.

2)   In March 2018, a payment was made to Brodahl & Jahren, which is a "Home Goods" store in Norway. A payment was made in the amount of 901,900 (NOK), which equates to approximately $106,000 US Dollars.

3)  Between October 2017 and March 2018, payments were made to Geir Helland AS, which is an architectural company in Norway.  Payments were made in the amount of 145,800 (NOK), which equates to approximately $17,000 in US Dollars.

4)  Between November 2017 and January 2018, payments were made to Lefdal Elektromarked AS, which is a home electronics store in Norway.  Payments were made in the amount of 239,702 (NOK), which equates to approximately $28,500 in US Dollars.

5)  Between November 2017 and March 2018, payments were made to Lefdal Installasjon AS, which is an electrical company in Norway.  Payments were made in the amount of 552,176 (NOK), which equates to approximately $65,000 in US Dollars.

6)  Between October 2017 and March 2018, payments were made to M&K Bygg AS, which is a construction/general contracting company in Norway.  Payments were made in the amount of 2,347,606 (NOK), which equates to approximately $277,000 in US Dollars.

7)  Between November 2017 and January 2018, payments were made Malefirma Ekenes, which is a painting company in Norway.  Payments were made in the amount of 166,612 (NOK), which equates to approximately $20,000 in US Dollars.

8)  Between December 2017 and February 2018, payments were made to Rorverket AS, which is a plumbing company in Norway.  Payments were made in the amount of 587,022 (NOK), which equates to approximately $69,000 in US Dollars.

9)  Between January and February 2018, payments were made to Unionconsult AS, which is a construction engineering company in Norway.  Payments were made in the amount of 146,250 (NOK), which equates to approximately $17,000 in US Dollars.

10) Between September 2017 and March 2018, payments were made to Upgrade Tomermester, which is a general construction company in Norway.  Payments were made in the amount of 4,025,008 (NOK), which equates to approximately $475,000 in US Dollars.

C.  On December 13, 2016, a payment was made to the Bertel O Steen Mercedes-Benz dealership in Oslo, Norway, for the purchase of a Mercedes GLC 250.  The purchase price of the vehicle was 700,000 (NOK), which equates to approximately $83,000 in US Dollars.

PEACHEY signed the purchase agreement for this vehicle. PEACHED signed the purchase agreement on behalf of JERICHO OUTREACH. Shortly thereafter, title to the vehicle transferred from JERICHO OUTREACH to CHRISTIAN CHARITY FOUNDATION.

D.   As stated above, approximately $2,700,000 was paid to JM Bullion Co. in the U.S. to purchase silver coins.

E.   Additional amounts appear to have been used to pay for personal living expenses.

### Second Letter Rogatory

38.   In October 2018, a second Letter Rogatory was granted by the United States District Court of South Dakota regarding this investigation and presented to Norwegian officials requesting assistance in locating and interviewing witnesses relating to this investigation in Norway. In December of 2018, investigators with IRS-CI and the FBI traveled to Oslo, Norway, and were present for interviews of witnesses of this investigation. The following information was obtained from these interviews.

39.


40.   PEACHEY told ▬▬ that invoices for the project would be handled by ▬▬▬▬ and should be issued to the CHRISTIAN CHARITY FOUNDATION (CCF), as CCF was responsible for funding the project. PEACHEY stated that ▬▬▬▬ would send the bills to the United States and request funds from a JERICHO OUTREACH bank account.

41.   PEACHEY told ▬▬ that CCF performed humanitarian projects but did not give specifics about what that meant. ▬▬ asked PEACHEY why they chose Norway and PEACHEY said because it was "like America and had the same values as America." PEACHEY said the CCF was designed to "help us to help you." ▬▬ thought the arrangement was unusual, so ▬▬ checked to see if CCF was registered with Norwegian Authorities. ▬▬ found a listing for JERICHO OUTREACH but nothing for CCF. This was a "red flag" and ▬▬ confronted PEACHEY about this. PEACHEY told ▬▬ that he [PEACHEY] was in the process of registering CCF and his "main goal" was to establish a base for



"our humanitarian work in Norway." A couple of days after this conversation, PEACHEY told ████ that everything was in order, and ████ confirmed that CCF had been registered with Norwegian Authorities.

42.     ████ stated that he also became familiar with ████ during the construction project at the residence. ████ stated that ████ made decisions about the interior décor for the house and was also the person to whom he sent the invoices. ████ stated that ████ had expensive taste and frequently picked the "high, high, highest end items all over the house."

43.     ████ stated that he also met an individual named "Lorin" who lived at the residence as well. ████ did not know Lorin's last name, but stated that he went by the nickname of "The General." Lorin has been identified by law enforcement as ROSIER. ████ stated that ROSIER and ████ previously lived in an apartment together in Oslo. ROSIER informed ████, "This (house renovation) is going to be my last gift to Lubova before I die." ████ was unsure how PEACHEY, ████, and ROSIER were all connected, but all were involved in the decision making process of the remodel and all three stayed or lived at the residence.

44.     ████ stated that the construction updates to the residence were very high end. ████ obtained a variety of expensive items for the house, including: a custom made door, custom cabinets, marble backsplash in the kitchen, a unique built in stove, custom made countertops from Spain, and custom made walk-in closets. ████ noted that payments for the remodel were always paid prior to the due date. ████ stated that the money was transferred into his account via wire transfer.

45.     In the Spring 2018, ROSIER and PEACHEY told ████ a shipment of silver coins would be delivered to the residence at Jongskollen 18 in Sandvika. Sometime in late May or early June 2018, an armored car arrived with the silver, and ████ was the only one at the house. ████ called PEACHEY to inform him of the delivery. PEACHEY told ████ that the silver should be placed in the detached garage. An area in the garage had been previously cleared out for the silver. The silver was in boxes and was placed against the walls of the garage so a car could still fit inside. There were 11,000 pounds of silver and a single armored car made two deliveries with the silver. During the delivery, PEACHEY arrived at the house and signed for the silver.

46.     ████ was interviewed on December 12, 2018, in Oslo, Norway. ████ was a plumber for a plumbing company in Norway called Rorverket AS. ████ stated that he and his company had been working on a remodel of a home located at Jongskollen 18, 1337 Sandvika, Norway. ████ stated that invoices from Rorverket AS for the remodel project were issued to the Christian Charity Foundation (CCF). ████ stated that they were skeptical about the job at first because the work went from a small job to a big job after

[14]

their first meeting and it involved a "charity foundation." ▇▇▇ stated that the remodel includes plans to add 3 additional stories below the current home and additional garage space. ▇▇▇ stated that his company had been working on bathrooms, kitchen, and in-floor heating at the residence. ▇▇▇ noted that the owners have chosen top of the line materials for the home and stated that most of the materials were imported from overseas because they were not available in Norway.

47. ▇▇▇▇▇▇ was interviewed in Oslo, Norway, on December 11, 2018. ▇▇▇ is a sales associate at the Mercedes-Benz dealership in Oslo. ▇▇▇ stated that PEACHEY purchased a vehicle from the dealership in December 2016. PEACHEY purchased a Mercedes GLC 250 4m in the amount of 700,000,00 NOK, which equates to approximately $83,000 in US Dollars.

48. ▇▇▇ stated that PEACHEY directed her to have the sale of the Mercedes listed in the name of the Christian Charity Foundation – Norway (CCF). ▇▇▇ stated that there was an issue with the money from the CCF account, so PEACHEY transferred the funds from an account held by JERICHO OUTREACH. PEACHEY then wanted the documents to reflect ownership transfer from JERICHO OUTREACH to CCF. ▇▇▇ noted that it was unusual that PEACHEY purchased the vehicle "as is" without haggling about the final sales price and without test driving the vehicle.

### Interview of Accountant in Norway

49. On December 13, 2018, law enforcement interviewed ▇▇▇▇▇ ▇▇▇▇ in Oslo, Norway. ▇▇▇▇▇ is an accountant and the owner of an accounting business in Norway. In the fall of 2018, PEACHEY was referred to ▇▇▇ as a potential accounting client. On October 20, 2018, PEACHEY and ▇▇▇ met with ▇▇▇ for about 2 hours. ▇▇▇ and PEACHEY wanted accounting help with two businesses, "Jericho Outreach Norway" and the "Christian Charity Foundation (CCF)." Prior to the meeting, ▇▇▇▇ sent links to a website for the companies, but ▇▇▇▇ stated that the website was vague and did not give specific information about the nature of the charity. ▇▇▇ was listed as the CEO of both organizations but PEACHEY did all of the talking with ▇▇▇. ▇▇▇ stated that PEACHEY appeared to be in charge and ▇▇▇ appeared to function like a secretary or administrative assistant.

50. PEACHEY and ▇▇▇ were evasive when ▇▇▇▇ asked them about the businesses. PEACHEY said they planned to buy and sell real estate in Norway and used the proceeds for charity. PEACHEY said they wanted to do charity work in Norway and other countries around the world. ▇▇▇▇ was skeptical about this because Norway has very few poor people and its government has exceptionally good programs to care for the few who are

poor. As such, there really is not a need for an outside charitable group to provide services in Norway.

51.        ████████ registered both businesses with Norwegian authorities (JERICHO OUTREACH on 10/09/2014 and CCF on 01/11/2016). ████████ registered JERICHO OUTREACH as a charity, but CCF was inadvertently registered as an ordinary business. In the summer of 2017, ████████ sent Norwegian authorities a letter and documentation to change the registration and argued that CCF should be tax exempt. ████████ included an official looking document supposedly certifying that CCF was a charity. ████████ provided a copy of the letter and charity document to ████████. The Norwegian Tax Authority then changed the classification of the entity based on the paperwork provided by ████████. Investigators reviewed the "official" documents that ████████ provided to Norwegian Officials and it appears that the documents are false. The documents claim that the organization is a "charitable" organization and give the appearance of a document that is certified by the IRS. Based on the experience of investigators on the case, these documents are false documents that are frequently used by groups with sovereign-citizen type beliefs to intentionally mislead.

52.        Peachey mentioned to ████████ that they were planning to purchase a car for use by the businesses and wanted to know about the tax implications in Norway. ████████ advised that if the car was used for personal purposes, then they would have to pay taxes on the use of the car. Peachey also told ████████ that they were renovating a house and wanted to know about the tax treatments of the expenses.

53.        ████████ commented that he had never experienced contact with a client like that before. After a 2-hour interview, ████████ normally has a good idea of what a client's business is doing. After the interview with PEACHEY and ████████, ████████ did not have any idea what they were actually doing and this made ████████ uncomfortable. ████████ stated that he ultimately declined to do any further work for PEACHEY and ████████.

### Interview of Nathan Peachey

54.        A telephonic interview of PEACHEY was conducted by law enforcement in June 2018. Peachey stated that he is a salesperson for "Essential Oils" and that is how he makes a living. PEACHEY stated that the "G47 Initiative", "International Silver Dollar Association (ISDA)," and "Jericho Outreach" were founded as an ecclesiastical sharing venture, but PEACHEY could not explain exactly what that meant. Peachey stated that he is not in charge of ISDA, G47, or JERICHO OUTREACH, but PEACHEY would not provide the names of the people that were in charge of the organizations. Investigators asked why he could not provide such information if the organizations were

[16]

legitimate, and PEACHEY stated that the information was under a Private Contract. PEACHEY stated that he does not receive any form of compensation from any of the organizations listed above. PEACHEY declined to provide the names of any of the supposed lawyers, board members, or leaders of the organizations. PEACHEY stated that the information was private. PEACHEY stated that WINER was not involved in these organizations except that he sometimes helped PEACHEY communicate with investors, including sending out emails. Investigators asked PEACHEY if he sent out communications or statements to investors to keep them up to date on the status of their investment portfolios, and PEACHEY stated that he was "working on statements." PEACHEY stated that he has used some investor money to obtain silver. PEACHEY sent the silver to Norway because "Norway is a neutral country under the blessings of the UN." PEACHEY stated that 4 shipments of silver were sent to Norway and were being stored in a "secure" warehouse.

### Third Letter Rogatory

55.    In May 2019, a third Letter Rogatory was granted by the United States District Court of South Dakota regarding this investigation and presented to Norwegian officials requesting assistance in conducting a search warrant at the residence located at Jongskollen 18 in Sandvika, Norway, and interviewing witnesses relating to this investigation in Norway. In June 2019, investigators with IRS-CI and the FBI traveled to Oslo, Norway, and were present for the search warrant and interview of ROSIER conducted by Norwegian officials.

56.    In June 2019, a search warrant was executed at the above-referenced residence in Norway. Multiple boxes of paper evidence were seized along with electronic evidence from computers and other electronic storage devices. ROSIER, PEACHEY, and ███████ contested that the search and seizure of evidence were "illegal" to the Norwegian courts. All claims and appeals were denied by every level of the Norwegian judicial system, including the Norwegian Supreme Court.

### Silver Coins

57.    During the course of the search warrant in Norway in June 2019, half of the silver shipped from the United States to the residence was located by law enforcement inside the residence. The other half of the silver was missing and only empty boxes located in the garage remained. ROSIER spoke with law enforcement during the search in Norway. ROSIER stated that the other half of the silver coins were recently "stolen" from the garage located at the residence at Jongskollen 18. ROSIER stated that the lock on the garage had not been broken, but a small window on the side of the garage was broken. ROSIER noted that he had the window repaired but could not remember who the carpenter was. ROSIER could not explain why only half of the silver coins were taken but surmised that someone must have surprised the unknown thieves in the middle

of their operation. ROSIER could also not explain why the thieves took the silver out of over 100 green storage boxes and left them behind in the garage. ROSIER could not recall when the theft occurred, but estimated that it was near the time of his most recent surgery while he was in the hospital. ROSIER did not file an insurance claim. ROSIER stated that he did not have an alarm system so he "knew" that the claim would be denied. ROSIER stated that he did contact the police department by phone, but the officer with whom he spoke said that no one was available to respond, and ROSIER would have to come to the police department to make a report. ROSIER did not ever make such a report at the department. Okokrim Investigator Frode Siljehaug told ROSIER that he checked the police records and no such telephone call had ever been logged.

### Interview of Lorin Rosier

58.   In June 2019, ROSIER was interviewed by law enforcement in Oslo, Norway. ROSIER stated that he met PEACHEY about 5 to 10 years ago and noted that PEACHEY wanted to partner with ROSIER in "social, humanitarian projects" and said he had investors that could fund such projects. ROSIER stated that he has been involved in humanitarian projects for many years.

59.   ROSIER stated that he operates several companies that conduct "humanitarian projects," including the CHRISTIAN CHARITY FOUNDATION (CCF) and JERICHO OUTREACH. ROSIER is in charge of these companies and named PEACHEY the "Secretary" and ███████ the "Treasurer." ROSIER stated that ███████ receives money each month from JERICHO OUTREACH but noted that it was "not a salary," although ROSIER could not explain the reason for the payments. ROSIER stated that PEACHEY's work is "voluntary."

60.   ROSIER and PEACHEY raised money for CCF and JERICHO OUTREACH from investors. ROSIER and PEACHEY told investors the principal was "sacred" and "would not be touched" for the charitable and humanitarian projects. ROSIER and PEACHEY also told investors that there would be an investment return. The money was supposed to be used for "charity projects in over a hundred countries around the world." However, ROSIER stated that, thus far, no such projects have been orchestrated and none of the money has been used for charitable work. ROSIER and PEACHEY have also not been able to provide a return on investment to any of the investors.

61.   Instead, ROSIER stated that the money was used to buy and refurbish a house and to buy silver. PEACHEY purchased silver in the United States and shipped it to ROSIER's address in Norway where it was stored in the garage. ROSIER admitted that the money raised from investors was used to buy and refurbish his "retirement house." The house ROSIER referred to was the residence located at Jongskollen 18, 1337 Sandvika, Norway. ROSIER justified his use of the money because the house was also to serve as the "International Headquarters" for CCF and JERICHO OUTREACH.

62.    Rosier stated that investor money was deposited into DNB bank accounts in Norway registered to Jericho Outreach.  Rosier stated that money deposited into or withdrawn from the accounts was handled by ▮▮▮▮▮ but at Rosier's direction.

63.    ROSIER stated that the G-47 INITIATIVE is another company operated by ROSIER and is similar to CCF and JERICHO OUTREACH in that it is engaged in humanitarian activities and has investors who were promised a return and that their principal would not be touched.  ROSIER stated that Essential Oils is a company in which PEACHEY is involved but the company does not have an office in Norway and is not related to ROSIER.

**Proffer of** ▮▮▮▮▮▮▮▮▮



68. 

69.

## Interviews of Investors in THE JOSEPH PROJECT

70.     Several investors in the Arizona and Colorado area invested in the scheme.  Between 2015 and 2018, nine investors from the area invested $10 million dollars into companies known as THE JOSEPH PROJECT and THE ALPHA TRADE GROUP.  These entities purported to carry out "humanitarian" missions and the money was to be used only as collateral in efforts to obtain more funding for the projects.  All $10 million ultimately ended up in accounts controlled by JERICHO OUTREACH, PEACHEY, ██████████, and/or ROSIER.

71.     Five million dollars from three investors went directly into a DNB Account in Norway under the name JERICHO OUTREACH.  This money, along with money obtained from other investors, was used, in part, to purchase silver coins and to purchase and renovate a home in Norway in which ROSIER, ████████, and PEACHEY were residing.

72.     On or about June 13, 2016, $5 million was wire transferred to an account at DNB Bank in Norway to an account in the name of JERICHO OUTREACH.  On or about April 14, 2017, $2.5 million was wire transferred to a Commonwealth Bank account in Australia in the name of the Alpha Trade Group, which was also controlled by ████████.  The nature of this account is not yet known and an MLAT request has been sent to Australia for bank account records.  A summary of the Phoenix investors whose money went to Norway follows.

73. 



74.

75.

76.

77.

78.

79.


### Second Interview of PEACHEY

80.    In October 2019, a second telephonic interview of PEACHEY was conducted by law enforcement.  PEACHEY stated that he does not know ████ or ████████, but is familiar with THE JOSEPH PROJECT (TJP).  PEACHEY stated that TJP is an "ecclesiastical group" which is "one of the assignments we took on."  PEACHEY explained, "We took money under an ecclesiastical agreement.  There were ecclesiastical terms and conditions.  It was an international group and I'm a small part of it."  PEACHEY stated that money from TJP was deposited into the JERICHO OUTREACH bank account in Norway.

81.    Law enforcement asked what the money was used for and PEACHEY indicated it was used for "humanitarian purposes."  Law enforcement asked PEACHEY what specific humanitarian purposes the money had gone toward.  PEACHEY said it had been used first to build a "giant house" which serves as "the international headquarters for the CHRISTIAN CHARITY FOUNDATION in Norway" and some of it had been used to purchase silver, which "the FBI had stolen."

82.    PEACHEY stated the funds had also been used to purchase a Mercedes Benz.  This was necessary because CCF sometimes hosted "visiting dignitaries." The Mercedes Benz was a used vehicle and such cars are common in Europe.  It was chosen because ROSIER used to run a Mercedes Benz dealership.  PEACHEY said it did not seem excessive even though it cost $80,000.  PEACHEY could not provide any examples of "foreign dignitaries" that had visited them in Norway.

83.    Currently, ROSIER and others are planning on building an American hospital in another country.  PEACHEY would not give the actual location of the country because "it is not your business."  Similarly, PEACHEY would not explain exactly what ROSIER's role in TJP was, except to say "ROSIER has been doing social and humanitarian projects for 50 or 60 years" and is a "Project Funding Specialist."

84.    PEACHEY stated that WINER, who was discussed previously, is "still a part of the ecclesia."  WINER was appointed to collect money on behalf of PEACHEY for investments in humanitarian and social causes.

85.    PEACHEY indicated that because FBI and IRS-CI agents were "statutory officers," they did not have jurisdiction over the "ecclesiastical matters" with which he was dealing.   PEACHEY warned law enforcement to "repent" because what they were doing with their investigation was wrong and "the hammer is going to come down."

### Items to Seize and/or Retrain

**Vehicle:**       **Mercedes GLC250 4M**
                   **VIN:** ███████████████

**Silver coins**

### Conclusion

Based on the foregoing and the information provided, probable cause exists to conclude that the aforementioned property was purchased or intended to be purchased with proceeds generated from an illegal investment fraud scheme and related wire/mail fraud activity or of proceeds traceable to such an exchange, or involved in money laundering activity, and is therefore subject to seizure and forfeiture under Title 18, United States Code, Sections 981(a) and (b) and 982, Title 21, United States Code, Sections 853, 881(b), and 881(a)(6), and Title 28, United States Code, Section 2461, and by utilizing provisions of Title 18 United States Code, Section 985, all of which relate to forfeiture for violations of the Title 18, United States Code, Sections 2, 1341, 1343, 1349, 1956, and 1957.

Corey Vickery, Special Agent
IRS – Criminal Investigation

Sworn to before me, and subscribed in my presence on the ___7th___ day of February, 2020, at Sioux Falls, South Dakota.

KAREN E. SCHREIER
United States District Judge

[23]

## ATTACHMENT A "REDACTED"

### Property to Be Seized

The property is more fully described as:

a.     Vehicle identified as:  Mercedes GLC250 4M, bearing VIN Number ; and

b.     Silver coins originally worth approximately U.S. $2,757,862.20, which were seized in June 2019, pursuant to a search warrant executed at the residence located at .

The associated seizure warrant authorizes the seizure of this property.

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

In the Matter of the Seizure of

20-013-04

No. _20 - mj - 12_

**SEIZURE WARRANT
"REDACTED"**

---

TO:   ANY AUTHORIZED LAW ENFORCEMENT OFFICER

An application by a federal law enforcement officer or an attorney for the government requests that certain property be seized as being subject to forfeiture to the United States of America.  The property is described in Attachment A, attached hereto and incorporated herein by reference:

I find that the Affidavit in this matter and any recorded testimony establish probable cause to seize the property described above, based on Title 18, United States Code, Sections 981(a)(1)(A), (a)(1)(C), and (b), and 982(a)(1), (a)(2)(E), (a)(2)(F), and (b)(1), Title 21, United States Code, Section 853, and Title 28, United States Code, Sections 1355(b)(2) and 2461, all of which relate to forfeiture for violations of the Title 18, United States Code, Sections 2, 1341, 1343, 1349, 1956, and 1957.

Therefore, you are hereby commanded to seize the specified property in Attachment A by serving this warrant and making the seizure or by transmitting such request to the Department of Justice's Office of International Affairs, leaving a copy of this warrant and receipt for the property so seized and prepare a written inventory of the property seized and promptly return this warrant as required by law.

The United States has, in its Application and Affidavit in support thereof, made the requisite showings under 21 U.S.C. § 853(f) that:

1.   there is probable cause to believe that the property to be seized would be subject to forfeiture, and

2.   an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture.

Therefore, the United States is authorized to seize the property to assure its availability for forfeiture.

As provided by 18 U.S.C. § 983(a)(3)(B)(ii)(II), the Criminal Seizure Warrant is a necessary step to preserve the United States' right to maintain custody of the property pending resolution of the criminal forfeiture alleged in the Superseding Indictment.   Civil forfeiture is authorized pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) and 985.   Such an action or proceeding for the recovery or enforcement of forfeiture incurred under any act of Congress for property located in foreign country is also authorized pursuant to 28 U.S.C. 1355(b).

Dated this __7th__ of February, 2020.

KAREN E. SCHREIER
United States District Judge

## ATTACHMENT A "REDACTED"

### Property to Be Seized

The property is more fully described as:

a.    Vehicle identified as:  Mercedes GLC250 4M, bearing VIN Number ; and

b.    Silver coins originally worth approximately U.S. $2,757,862.20, which were seized in June 2019, pursuant to a search warrant executed at the residence located at .

The associated seizure warrant authorizes the seizure of this property.